Call the case. Case number 153653 Patrick Leonard v. Warden of the Ohio State Penitentiary. Oral argument is not to exceed 30 minutes per side. Ms. Wood for the appellant. Good afternoon and may it please the court. My name is Nadia Wood and I represent Patrick Leonard. I would like to reserve five minutes for rebuttal please. Very well. Thank you. Mr. Leonard received an unfair trial. His verdict and death sentence are unreliable for two reasons that I would like to discuss today. First, he was visibly restrained without justification. And second, his counsel labored under a conflict of interest that adversely impacted their performance. State court decisions on these matters are not reliable. First, as to the stumbelt, Mr. Leonard was visibly restrained throughout the trial for no reason as the never presented any disciplinary problems. He turned himself in. He was not a flight risk. He was never hostile to his attorneys. And yet, the court placed the stumbelt on him for the entire duration of the trial. He even had to go up to the stand and testify with a stumbelt on. There were an awful lot of witnesses who said it was not visible. The bailiff, court reporter, two police officers, prosecutor, priest, said they never saw it under his clothes. Well, that hearing was six years after the trial. It's hard for deputies to remember a particular trial. But it is a state court factual finding, correct? That was a trial court's finding. That's not the court of appeals finding, however. And we have a videotape and a picture and a brief. Just, you know, obviously we owe a lot of deference. And what did the court of appeals say that did not amount to a finding? I mean, I thought the state court said these were not visible. The court of appeals, the latest decision on the merits that replaces a trial court's decision, actually says what the finding that they made was that there was a compelling need. And they focused on things like the need for the restraints, the small courtroom, the detention in the courtroom, the nature of his crimes, which is not a valid determination. It is not an individualized finding specific to this defendant. So the court of appeals never actually said, and we find that these restraints were not visible. They merely recited trial court's findings and then made their finding about compelling need. Well, it sounds like you still have a state court finding that's undisturbed that it was not visible. And we ask that you find that finding as an unreasonable determination of fact, because you can see the photographs, you can see the video from that trial, and you can see the stumbelt, the box, visible. Moreover, in the record, we have a photograph of the remote, the second part of the stumbelt, that was outside the close, that was handled by deputies sitting two feet away from him. And that huge remote is clearly labeled stumbelt, react belt. And you can see that in the record, the 61-126698. I did look at the pool TV coverage that you asked us to look at. I think it's fair to say that there are at least two conclusions or observations you can draw from that. First off, if that's what you're relying upon, at least in part to say that this was unreasonable, yes, you can see there's something protruding from his back. There's no question about that. But I don't know how long this trial lasted, but it's an exceptionally short period of time appearing on that TV that you could see that there was anything unusual about him at all. That's observation number one. Observation number two is you keep saying you could see the stumbelt box. When you append those words to the box, it's linguistically correct. You can see something that is of a square shape that's sticking a little bit out of his back. How anybody would have any idea, one, that was a stumbelt, and two, thereby draw this adverse inference that this guy must be really dangerous, so he probably did it, really is, it seems to me, an incredible stretch to make. So I looked at what you asked for, so your reaction to those observations would be useful. Well, Your Honor, the videotape only did capture a very short moment, but the jury was there in this incredibly small claustrophobic courtroom. He's not wandering around when the jury is there. He's in the courtroom by the time the jury is brought in, at least the way trials normally work, and he's still sitting there when the jury is let out. So the only time, unless you correct me, that they saw him when they could even see his back was when he got up to give his unsworn statement. Second of all, there's a lot made of he's sitting up forward and he can't touch his back to the back of his seat. It's ironic that the pool coverage clearly refutes that. What you see on the pool coverage is a person that might be slouching a little bit, but his back is absolutely right up against the back of the chair. So how, even when you combine that, somebody would know, geez, there's something odd going on here, and therefore it must be a stumbelt that I would submit 99% of people don't even exist, seems to me to be hard to understand. So how do you respond to that? Well, a couple of reasons, Your Honor. In this particular courtroom, the way the jury was set up, his profile was mere feet away from the jury box for the entire two-week trial. So even though they could see the entirety of his back only for a brief time while he walked to testify on his behalf, but during trial, they could see his profile and the back for the entire duration. That's in the post-conviction hearing. You can see photos of the courtroom. That's interesting, because I guess I've never seen a courtroom where anybody other than the government was closest to the jury box. That's the way the courtroom was laid out, and that's a part of the testimony. And second, again— I say, do we have any pictures of what a juror would see from the side? There are some pictures in post-conviction hearing. We can double-check. There are pictures of the courtroom and the way it was laid out. And as far as the— No, I'm asking you. You asked us to look at the pool coverage. We did that. So is there—that doesn't include any view from the side, right? That does not. But there are some additional— So how is that an unreasonable determination by the state if we don't even have a picture of what it looks like from the side? A picture of the jury room or the side of the stumbelt? I don't care about the jury room. I care about the guy, the guy that has this. You say something protruding out that's really obvious, and therefore, they'd know it's a stumbelt. Well, it's the photo from the pool coverage, and I would like to clarify that the pool coverage was not necessarily done during trial. During the post-conviction hearing, one of the deputies said they get their camera shots during motions. That's testimony of Robert Weber on document 61-16, page ID 9011. So his demeanor and his reactions may have been very different when the jury is not in the room and the deputy is not necessarily holding the transmitter as closely. I agree. It may have been, but how do we know that? Well, Your Honor, under the circumstances of this particular trial, where the jury had an opportunity to observe him in profile, where they know the nature of the trial, that thing on his back could not be anything other than the restraint. And there were additional witnesses that did testify and submitted affidavits in the support of the post-conviction petition that they could see it, that they could see the outline. And they certainly could see the remote pass. You're missing the import of my questions. I'm not questioning whether they saw the outline of something on his back. Based on the pool coverage, I'm assuming that they probably did. Who even knows what a stumbelt is, let alone knowing that protrusion was a stumbelt? Not only his own relatives didn't know what that was on his back. But they could see that it's some type of physical restraint. No, no. They could see there was something on his back. They couldn't see that it was a physical restraint. So given that all the Supreme Court language talks about something that is obvious is a restraint, how do you get over the hurdle that it's something on his back? We don't know what it is. We don't know that it's a stumbelt. We don't know that it's a restraint. The relatives testified that his movements were restricted. It's not just a restraint. And the Supreme Court doesn't just talk about visible restraints. The DEC, the opinion in DEC, relies on three fundamental principles of law. One is the presumption of innocence, for which visible restraints are important. But the second one articulated in DEC was the ability to participate in own defense, for which only physical restraints. The Supreme Court emphasized physical restraints, not visible restraints. Just as important. Constitutional provisions that you're basing a stumbelt claim on, right? Due process, you're saying the stumbelt kind of refutes the presumption of innocence. Sixth Amendment claim, you're saying it interferes with his discussing things with his lawyer. And I guess the Eighth Amendment, I forget what. You had a separate Eighth Amendment theory. So you're kind of mixing those together, just in what you just said. DEC, as to the due process, DEC requires the restraints to be visible. We had a case, Mendoza, where we said DEC referred six times to the fact that the restraint has to be visible. That's not a requirement we can overlook on habeas. And it seems like you may have the same problem here. Well, before the Mendoza opinion, a couple of months before that, this court issued United States v. Miller, in which this court considered the similar question on the stumbelt issue and cited two cases, the 9th Circuit and 11th case, that discussed stumbelts and said the stumbelts are subject to the same judicial scrutiny. That was a decision that's- If it's visible. I mean, in DEC, you'll recall, they had the front of the table where the defendant was sitting, they had brown paper covering it. And his argument was, well, come on. People know that he's probably got some kind of leg restraints under there or something. But they weren't visible. And on habeas, you know how constrained we are in habeas. We could not sort of, you know, extend it to a situation where they can't see it, but maybe they could figure it out. And it seems like we're kind of in the same situation here as to your due process claim. Well, Your Honor, in this case, this case is different because in Mendoza, the court actually went out of its way to make sure that those restraints are not visible. And in Mendoza, the defendant testified unshackled without any restraints whatsoever. Leonard had to testify with a stump belt on. And part of his claim is that he had to cut his statement short because it was so uncomfortable and he was so nervous. He could not focus on what was going on in the courtroom because he was concerned that at any moment he could get zapped with 50,000 volts of electricity. What's the support for this restraint having adversely impact his ability to give this unsworn statement? Because we have the transcript of his unsworn statement, and it simply ends at what appears to be a normal conclusion. And the court says anything further, and then the case is either over or goes on. There's nothing in this transcript that suggests that he was impacted by what he had on. Well, Leonard testified at a post-conviction hearing. And what he testified to was that he had to cut it short because he was so uncomfortable with the stump belt. And the... And so maybe a better way to say it is, is there anything that corroborates that? Because that does not appear to be consistent with or corroborated by the transcript of the proceeding. Well, that's the best evidence of what we have. That was his statement, his preparation, and his perception. But I also urge you to look at the second portion of the analysis in DEC that talks about the inherently prejudicial effect of physical restraints, not necessarily visible restraints. It talks about how restraints may confuse the defendant's mental faculties, his ability to perceive what is going on. It's the same analysis as United States v. Durham. There was a 2002 opinion on which United States v. Miller relied, this court, to find that stump belts are subject to the same judicial scrutiny. But at this time, if... Didn't your client sign some sort of consent form pertaining to the wearing of the stun device? Didn't he sign... Didn't they have him... Or he signed some form? How does that factor into this? It is not exactly a consent form. It's more like an informational statement. It tells him that if he does anything that will be perceived as aggressive, he will be electrocuted, will likely fall to the floor, urinate on himself. It was not a consent. He was explicitly told that even if you don't sign it, we will put one on you anyway. Well, that doesn't sound like a consent form. It is not. But at this time, if you don't have any questions on this issue, I would like to go and discuss the conflicts of interest issue. All right. There are two components to the conflict of interest in this case, the ongoing civil suit and close relationship of counsel with Leonard's family. First, Leonard and his brother's corporation were co-defendants in the wrongful death civil lawsuit brought by the victim's estate. The estate alleged that Leonard was driving a company vehicle while he committed his crime as a basis for liability. The same attorneys who represented Leonard in the capital murder case also represented his brother's corporation, but not Leonard in the civil suit. That lawsuit was based on identical facts. And this created a non-constitutional conflict because this conflict adversely affected client's investigation, counsel's investigation, and presentation of mitigation evidence. The theory of liability, as I understand it, in the two civil suits, I think for both, but please correct me if I'm mistaken, was simply that Leonard had driven the company van to the scene of the eventual murder. Is that correct? Yes, Your Honor. In addition, he was charged with kidnapping by using that van to block the exit from- But the basis for holding the company liable was simply that they had allowed him to use this van. Is that correct? Yes, Your Honor. I don't see how testimony that his brother belittled him as a boss or that he had an emotionally distant upbringing or something, how that at all is adverse to the company's interest in that suit. It just seems to be utterly irrelevant to the company's liability in that suit. And so why is there a conflict? Well, the company is at risk for a substantial verdict. And it's the only one with resources in this lawsuit. Sure. No, they're going after the company because they're collectible, and presumably he isn't. He isn't. And part of the company's liability, the underlying theory, is the foreseeability. If the company, if the shareholders, who also happen to be his brothers, could foresee this happening, then the company could be held liable. It overlaps with mitigation. Counsel at, in a capital punishment case, has a duty to present mitigation that puts in context how this person who is on trial developed, how he led his life that made him commit this crime. The theory is the brother should have known. It was foreseeable to the brother that when they let him use the van that day that he  The theory here is that if they had presented competent mitigation to put his entire life and childhood in context, as mitigation counsel is obligated to do, then that evidence could be used by opposing counsel in a civil suit to argue it was foreseeable to the shareholders. Just seems like a real stretch. I mean, if we look at the particular evidence, okay, you know, the brother sort of, let's just put it in terms favorable to you. The brother belittles him as a boss. He felt like the black sheep of the family. His parents were emotionally distant. How does that matter to whether the company or the brother should loan him a van on a particular afternoon? Well, it's not just that evidence, Your Honor, but also Seems very far removed from the, you know, whether it's negligent to let him drive a van. What you're conflating is the duty in the civil case with mitigation in the death case. We're trying to figure out how those two fit together. They just don't seem to fit together. If counsel had presented the mitigation evidence that they didn't actually investigate, but had they investigated and presented this evidence that Leonard had this volatile relationship with Flick, that the brothers knew about it because Steve Leonard, we have notes from the investigator saying he knew Don Flick from the day she was born. So, therefore, they shouldn't have let him drive a van because maybe at night, in the middle of the night, he's going to go run her off the road and murder her? Well, that would be the opposing counsel's argument in the civil suit. Did the opposing counsel even make that argument? Your Honor, the counsel in the mitigation phase, Leonard's counsel, didn't investigate any of this. They focused only on good things. That's not what I asked you, but you're right. I wasn't as specific, perhaps, as I should have been. Was what you're speculating here, was the conflict a part of the theory advanced in the civil case? The civil case did not, against the corporation, did not get developed because the corporation filed an answer and Leonard defaulted because he was, per se, in that suit. So, those arguments did not get developed. The estate dismissed... When did the termination of that case, then, occur relative to the proceedings in the death case? The estate dismissed their suit after he was found guilty and the jury recommended death. And that's an erroneous determination of fact by the state court because they said the suit was dismissed before trial. Here we have a case of concurrent, ongoing representation. Could you speak a little bit? Because I think it affects not only this argument you're making now, but we're going to hear about it again later. The large premise of these arguments is that there were things that should have been investigated and worked, and had they been investigated, there was relevant mitigation evidence that would have been presented. It appears as if almost, if not all, of that evidence was, in fact, presented in one form or the other. So, tell us exactly what it was that this investigation would have revealed that simply wasn't presented in any way, shape, or form by any of the witnesses in the case. That Ryan Grise, who showed up at the door that night... I'm sorry, what? Ryan Grise, the man who showed up at the door that night, who was shot at. Leonard's sister provided an affidavit that Ryan and Don Flick were in a relationship and that Leonard believed that while he's trying to reconcile with Don, this man, her former acquaintance, shows up at his door and that's what made him snap. And that theory of mitigation was never developed and nothing about this was presented. And that is mitigating how? That she had a relationship with Ryan Grise, I think, or Grise? How is that mitigating? That would have put his crime in context. He thinks it's not just a friend who shows up at the door. What's the evidence that Leonard even knew that the person knocking at the door was Grise? Because she, Don Flick, told him that she was supposed to head over to their house and made a phone call to Ryan Grise saying, don't come over or I'm not heading over to your place. So he knew that the phone call immediately preceded this person showing up at the door. Why is jealousy, that's a motivation, why does that amount to a mitigation factor? Well, his family history would have shown that because of his limited emotional upbringing, this kind of stunted emotional development, he didn't know how to handle jealousy, how to handle rejection or how to express love. And that's what led him to commit that crime. And his brothers who owned the corporation would have known all about it. They would have been part of his development. Do you do other death cases? I, this is my first argument in this court. Have you been involved in other ones? Just briefly. Okay. The reason that I'm asking, I'm not trying to put you on the spot on that. You're doing fine. I think it would be safe to say, at least the ones that I've seen, that Leonard probably had the best and most normal upbringing of any defendant I've ever seen in a death case where there is a question about presentation of mitigating evidence by his or her attorney. So I was going to ask you if that seemed to be a fair observation or not, but if you don't know, that's fine. I'm not qualified to make that observation, but... Fair enough. If given his lack of prior record, I would say that gives more credence to our argument that his sentence is disproportionate to his crime. Maybe it does, maybe it doesn't. And so let me sort of develop a question for you that I'd like to get your reaction to. One of the things that I get the sense that you say should have been either developed, because it wasn't, or better developed if it was, was this idea that he was singled out to go to public school instead of parochial school. The question that that brings to mind is, I'm just wondering, it seems as likely as not, that had that actually been a theory that was advanced by the defense counsel in this case, that would have had such an overwhelmingly negative reaction by the jury that it actually would have hurt more than it helped. So I'm interested in your reaction to that. The theory that he was singled out? The theory that one of the reasons why he killed his girlfriend was that he was forced to go to public school instead of private school. Well, Your Honor, that's just one element of a very rich background. That is an element. So I'm just saying, yeah, maybe you're thinking after the fact that should have been presented. I'm just raising the question of whether it wouldn't have actually been worse, in which case it's really just a strategic decision by counsel. Your Honor, it cannot be a strategic decision by counsel, because counsel didn't investigate any of this. You're saying they didn't know he went to public school? Your Honor, what we know is what counsel asked to investigate. And they don't know what they knew about public or private school, do they? That's not on the record. But what's in the record is their request to investigate all good things possible. That's what they focused on. If you investigate only the good things, you don't get a complete picture of his background. You cannot present complete mitigation. You cannot make a strategic decision about presenting mitigation, because you don't know what's out there. Counsel, in almost all of these cases, the habeas counsel are able to identify something, a witness that says they were never talked to, and that this is the information that only they had, and the counsel wouldn't know if they hadn't talked to him, maybe a psychiatrist or family member or something like that. I guess in this case, we don't really know what the attorney did or did not know about some of these upbringing issues, do we? We know that one of the attorneys was a close family friend and could have been a mitigation witness, which is another reason why he should not have taken on this representation. You're answering the question by moving on to something else. Do we have anything from the attorneys that said, jeez, I didn't know that, I kind of screwed up here? If I had known that, I would have made that to be part of our mitigation case? No, Your Honor, but that's not determinative. We can objectively look at what they did and did not investigate and conclude that this was not a strategic decision. I would like to save the rest of my time for rebuttal. All right. That may please the court. Relative to the Shackling claim, the district court was correct in determining it was a merits adjudication in the state court system. The warden contended that there was a default since it was presented on a post-conviction as opposed to direct appeal. It would seem to be a direct appeal claim. However, despite all that, the trial court on post-conviction evaluated the Shackling claim and denied it on post-conviction. It was appealed to the first district court of appeals who reversed and said, have a factual hearing. By the time the Shackling claim gets back to the post-conviction trial court, there's a full evidentiary hearing and findings of fact. So the district court properly determined that the Shackling claim was a merits adjudication by the state court system, which would have an impact on how this court evaluates the Shackling claim under AEDPA. Now, with that being said, I would like to just summarize very briefly where I believe the court would or should go with the Shackling claim. And it hinges on a dispositive fact. The dispositive fact being that the restraint was not visible. When you- Restraint, qua restraint. Yes, exactly. It's exactly right. And specifically, the trial court on post-conviction addressed that issue. And there's probably two good examples. First of all, Mr. Leonard's sister testified during post-conviction proceedings and said, I saw a five by five inch square on his back. I didn't know what it was. She apparently did not know until the post-conviction proceedings that this was EACT, an electrical restraint type belt. So the trial court then took that fact that the sister saw an unknown five by five inch square on her brother's back as he walked up, and this is exactly right, the only time that, as far as we can tell on the record, where the jury, and see, this is again, the visibility, it's a juror issue. You have to determine it visible to the jury as opposed to anybody else. And the record probably would bear this out, but of course, normal courtroom protocol is that the parties are seated when the jury's brought in. So a consequence- Normal courtroom protocol that the defendant gets up when the jury comes in too. That very well may be the case, but nevertheless, I think that's where you would come to the conclusion that the only time the jury would have been able to have a direct view of this unknown five by five inch square was when Mr. Leonard was walking up to the stand for the unsworn statement, and then presumably for a little time as he turned to sit back down, coming back from making the unsworn statement. But the whole theory was any sort of protrusion, then you're going to figure out it's a restraint and therefore it's the equivalent of being visible. So she says it's not limited to just walking up to give his statement back, that they could see it the entire time from the side when he's sitting in the chair. Now, do you have a response to that? That's not in evidence. I believe that would be petitioner's evaluation of speculation based on the circumstances of the case, but that is not a state court finding of fact. The state court finding of fact was that the restraint as a restraint was not visible. And once that dispositive fact is made, and then this court does a merits adjudication under ADPA, the court's precedent from, I think it's the Mendoza case. Well, Adams versus Bradshaw is the most recent pronouncement which uses a dispositive finding of no visible restraint, and the Adams court relied on an Earhart case from the Sixth Circuit in 2009, and Earhart built on the Mendoza case where you have the dispositive finding of fact that the restraint is not visible. Once you have that dispositive finding of fact, there is no constitutional issue. There's no established Supreme Court precedent any longer that would show there was some sort of constitutional violation notwithstanding the non-visibility as a restraint. That would be accurate, Your Honor. And I think this court has fairly well unequivocally said in Adams versus Bradshaw on page 317, if a petitioner's stun belt was a visible restraint, due process mandates an individual finding a necessity before state courts could require the petitioner to wear a belt. If the stun belt was not visible, then there is not a violation of clearly established federal law sufficient to grant through it, which is exactly what you said. That's correct. And that's Adams versus Bradshaw. Point that I'm making is, Your Honor, there's this dispositive state court finding of fact which would seem to, under this court's precedent, dictate the result that the district court promptly denied the writ. To get a little bit technical about this finding of fact process, the trial court did an evidentiary hearing and made findings of fact. State post-conviction you're talking about? On post-conviction, and it's a merits adjudication. Now, the trial court actually made three findings in general. The first was a mixed question of law and fact to the effect that the restraint device, even though there was no prior hearing at the trial level, the post-conviction court determined that the restraint was properly used because of factors in the case and issues of courtroom security. That's kind of a mixed question of law and fact. The other two findings are really pure fact findings, the one most dispositive being that the restraint was not visible. The trial court post-conviction, trial court also made a specific finding that this device did not interfere with Mr. Leonard's ability to interact or communicate with his counsel. And that particular finding of fact goes to the Sixth Amendment question. The lack of visibility, I believe, is the Fifth Amendment question. And then also under the Sixth Amendment question, there is, I think, truly a lack of clearly established federal law relative to the question of however the state may or may not somehow interfere with a defendant's ability to communicate with his attorneys. The existing precedent, Your Honor, deals directly with in cases where a trial court has forbid the defendant to speak with a defense attorney and vice versa. I believe there was one case, and this is on a Sixth Amendment issue, and this is just purely academic discussion. The Sixth Amendment issue of the interference question, the cases that seem to be in existence refer to a trial judge's preclusion of communication. Just don't talk to your attorney. When that was done on an overnight basis, I believe there was a court determined that in fact was a Sixth Amendment violation. When a trial court forbid the defendant from communicating with his attorney during a 15 minute break, and I believe the defendant was on the stand, the court in that case determined there was no interference that implicated the Sixth Amendment. That's just actually somewhat of a side issue, but the point that I'm making is that although on the shackling per se, there's a body of case law, particularly out of this court, the Adams, the Earhart, and the Mendoza, that I believe the court would have to assess in adjudicating this claim. There is no similar body of law anywhere relative to use of restraints and interfering with defendant's ability to participate in the trial. I think that would have an AEDPA impact because they're frankly, to the warden's understanding, Your Honor, there is no body of law to apply to this Sixth Amendment question. With that being said, the trial court made these three findings, one of them being a mixed question of law and fact. The Court of Appeals, and keep in mind when Mr. Leonard appealed the adjudication, the post-conviction adjudication to the Court of Appeals, Mr. Leonard obviously is challenging everything. He's challenging the law, he's challenging the facts, and then the matter goes to the First District Court of Appeals. The way the First District Court of Appeals wrote their opinion, they recited the Leonard's challenges in context of the facts as found by the trial court, but it was more of somewhat in the nature of how a magistrate would report to the judge, say, The Court of Appeals most pointedly did is they entered an express finding, and this would be in the appendix, page ID 5261, it's paragraph 16. The Court of Appeals specifically said, we find that the trial court properly determined that the security device could have been used, that the rationale for using the device was proper. What then happened before the magistrate judge and the district judge is that Petitioner Leonard was questioning this same issue as to where's the findings of fact, and the Court of Appeals didn't exactly say this and that. Specifically, the Court of Appeals, there's nothing in the Court of Appeals' opinion that specifically says, we find the restraints were not visible. Now, the workup to their conclusion in paragraph 16, there's a recitation that that's what the trial court found. Leonard was challenging that finding of fact. The point that I'm making, first of all, the Court of Appeals did not reject that finding of fact. Second of all, both the magistrate judge and the district judge in determining what was important for adjudication of this claim, determined that the lack of visibility, the finding of fact that expressly was made by the trial judge, was able to be evaluated in an AEDPA context. And specifically, the authority to do so from the magistrate judge's perspective was derived from Vasquez v. Bradshaw, which is a case of this court, 345 Fed Appendix 104 at page 7 of the opinion, specifically footnote 1. And footnote 1, the way the magistrate judge evaluated it, he said that where you have a situation such as this where there's an appellate court adjudication that certainly upholds trial court findings of fact, but that the appellate court doesn't repeat the findings of fact, it is appropriate, and I believe it was under the Vasquez case, footnote 1, to look to the findings of fact as issued by the trial court for elimination of this AEDPA question, which is- I apologize for interrupting. I've lost complete track of what point are you trying to make here? What is the point of all this? The point of what I'm just saying here is, Your Honor, is that the trial court finding of fact is dispositive. Okay. And that is that it was not visible. Not visible. Got that. The fact- Do we need to spend more time on that? No, Your Honor. No, it's- Vasquez footnote 1- Okay. We got it. Means that because the court of appeals didn't repeat the finding of fact, it doesn't mean it doesn't exist. Do you want to talk about the conflict of interest? Yes, Your Honor. The conflict claim, we would submit that the district court and the magistrate judge properly denied the writ on this conflict claim specifically because the case law that's associated with this conflict of interest claim, the facts are normally very much related to the criminal context itself where a defense counsel is representing other defendants in a- That's the usual. You guys involved in some criminal activity, conspiracy, and somebody's representing both. That body of law is not a doctrine of loyalty. It's a doctrine of interfering with a defendant's proper representation because the attorney is attempting to protect another defendant. The point that I'm making is, Your Honor, is that there's no body of case law that in is that the allegation is the trial defense attorneys subjectively would have divided loyalty. First of all, there's no body of case- Go beyond that. I mean, they say that the family is paying, I think it was at Strong's legal fees, and so that he would, well, maybe, I don't know. Maybe that does go to your point that he would be reluctant to make them look bad. Is that what you're getting at? That is a subjective allegation. What about the two pending civil cases? The civil cases, I believe, and I believe the record would bear this out, is that the company was dismissed out. They were presumably on summary judgment. But opposing counsel has said that was after the trial in this criminal case. If, in fact, that's the case, it doesn't change any evaluation because in context of the case where the only connection with the so-called family business and the crime would be the defendant driving the van- That's not why she's arguing that. She's arguing that the court made a mistake saying that it was, the court was under misunderstanding thinking the company got dismissed out before the trial when it was actually after the trial. So you have to concede, I would think, that if there was something inimicable about the position they were going to take on behalf of the company and this defendant, that could be an actual conflict, right? Your Honor, I would disagree. Really? I would disagree for two reasons. First of all, legally, there's no body of case law that deals with this type of subjective issue. How about just common sense? I'm not saying it's not, Your Honor. I'm just saying that the body of case law on this point is defendant-specific. An attorney representing- You're saying that there isn't a case that says that when it's not representing two else in a criminal case, that even though there's a completely conflicting interest between the two, that's okay on habeas because there's no case that says that? Is that it? Your Honor, what I'm saying is that there's no body of case law that addresses that issue as a constitutional matter. You might be demanding a little more specificity in terms of what is relevant Supreme Court precedent for a habeas claim than the law actually requires there. Your Honor, that would be accurate. But that means your argument's wrong. Second of all- Let's assume that probably you might have a little trouble with your first argument. How about whether there really was something that they should have done and didn't do, or didn't do well? Was there an actual conflict? Or was there prejudice? How about this? Or prejudice? Assume there is a conflict, even though you say we don't have any cases that say that. Fine. Your real argument is that even if there was, there wasn't any prejudice here, right? That is correct as well. So that's going right to her argument. So that'd be kind of fun. Respond to her argument that there was prejudice. There was no prejudice because, as the district court concluded, the was a lack of a vigorous castigating of the family. And Mr. Leonard said- First thing that she says that you're skipping over is that they didn't do an adequate investigation. And that's a pretty common argument in every mitigation case. So they say they didn't investigate to find out that there were some problems with the family, either because they were incompetent or they didn't want to know because they represented the company. So that's the first thing you have to address. That's the allegation. Right. This is your opportunity to respond to that argument. Yes. The response is that the evidence on the question of prejudice was cumulative. It was the same stuff. It was the same stuff. You don't want to address the investigation argument? Well, it was presented- The big issue for the prejudice evidence, so to speak, was this psychologist doctor that spoke of the coldness of the family. The magistrate judge and the district judge said, well, that's what was presented during mitigation. There was a psychologist that testified during mitigation to the effect that the family was less than nurturing. And of course, then the question is, how mitigating is that anyway? But there was, in fact, evidence at the trial from a psychologist that the family was less than nurturing, that the father was rigid and militaristic. The post-conviction evidence from this psychologist was the same stuff. So as the district judge and the magistrate judge determined that there is no evidence of prejudice on the conflict claim because the supposed new mitigation evidence was the same as what, in fact, was presented at trial. So there's no prejudice because there's nothing evident that was omitted that could have been pursued had this hypothetical conflict not been present. So that's the response, that there's no prejudice because the new evidence is the same as the old evidence. Also, the question on the lawsuit, an employer would necessarily say that an employee was off on a lark of his own, that even though an individual might have had company property, that he was off on a lark of his own. There's really not, in that type of position, you're simply trying to distance your, the employer would be trying to distance himself from the employee and say, whatever happened or whatever went on, we don't know, we've got nothing to do with it. That in and of itself really would have no conflict with the defense that was presented by Mr. Leonard, which he actually was successful. He beat two attempted murder charges and got the rate broken down from a rape charge to an attempted rape. And it was these defense attorneys did that. So these are all factors that suggest that the district court properly concluded that the state court properly rejected the conflict claim. And I've got nothing further to add unless the court has questions. One quick question. Sort of the flip side of the question I asked Ms. Wood about the quality of the mitigation evidence that they claim should have been presented and wasn't. The flip side of that is whether this is really one of the worst of the worst claims that would generally engender the death penalty. And again, I would say of all the ones I've had, this is probably one of the more innocuous murders, if there is such a thing, in terms of it being death eligible to begin with. Whether I'm right or wrong about that, that seems to me, if I'm right, to then have a relationship to how important mitigation was. A lot of times we would say, well, okay, you could have done this, you could have done that. But the strength of guilt and the strength of the aggregators was so strong here that it really wouldn't have made any difference. I don't see that we could, if we wanted to, I don't see that we could say that here. Because no question that he murdered her, maybe occurred during the course of an attempted rape, maybe didn't. Shoots her three times in the head. But generally a murder of a girlfriend or a spouse because you're jealous or mad doesn't engender the death penalty. Your Honor, that's a good point. And my response to that is this same jury basically acquitted Mr. Leonard of three charges. The same jury that recommended death acquitted Mr. Leonard of two counts of attempted murder, shooting through the door. They found felonious assault, lesser included. The same jury that had a charge of rape but found a lesser included of attempted rape, that same jury recommended death. So I think that while you have a very good question, we have an answer to the question in the very fact that this same jury that cut Mr. Leonard some breaks nevertheless recommended death. The attempted rape was one of the aggravators, right? Yeah, it's a felony murder, rape or attempt. So the forensic evidence of rape was not only that she's handcuffed, but that she has bruises from them because she's struggling. And the configuration of her clothing. And the dress marks on her neck from her necklace, presumably because she was getting strangled. Mr. Leonard as well said there was a sexual encounter. His characterization of it was voluntary, but it's Mr. Leonard himself that injects the sexual encounter into this, these set of facts as you've pointed out. But it's the same jury, Your Honor. It's the same jury. So I think that that would be the case with that. And I'm out of time. Thank you. Your Honor, to answer your questions about prejudice on investigation, we don't have to show prejudice here. Under Kyler, that's a lower standard than Strickland. Prejudice here is presumed if we can show that there was an alternative theory of mitigation or adverse effect. Something that counsel could have done, didn't do. Here they didn't. Do you know that theory would really get somewhere? No, Your Honor. Just there was an alternative theory. You can have an alternative theory, no matter how fanciful or unbelievable, and then you don't have to show prejudice? Just that there was a conflict. It's a requirement of actual conflict, but not prejudice. So here, the actual conflict, there was a divergent theory. As Mr.  What about the ability to waive the conflict? Because Mr. Leonard was questioned about whether he knew of the conflict and would relinquish any concerns that anyone might have. So he, according to the record, he made the determination that he didn't care about the conflict. There was nothing in the record about the conflict, Your Honor. He never waived it. He never signed the form. No, he didn't sign anything. But I saw something in the record where it was discussed or presented to him. I'm not aware of anything like that in the record, Your Honor. Okay, well, the record is what it is, so we'll look back again. Well, you know, another problem you have is, it seems like the theory that you're saying they should have advocated largely came through by means of the testimony of Dr. Hawkins and by means of the testimony of the woman with whom Leonard fathered one or two children. I mean, Hawkins said that Leonard felt personally inadequate, that he grew up in a rigid household. Emotions just weren't allowed. But he didn't connect how that explained the crime. He didn't put anything in context. And that was because the trial attorneys didn't give him the information necessary to make that connection and really explain it. What is that connection? Because it doesn't jump out at me. It was a crime of passion, that he didn't know how to deal with the stress of someone showing up at the door while he's trying to reconcile with his girlfriend. They showed up at the door while he was attempting to rape her, is how this case comes to us. Your Honor, he always denied it. He immediately turned himself to the attorneys. I mean, is the attempted rape finding something we somehow set aside here? Well, we did contest the sufficiency of the evidence on that charge because he always maintained that he never forced himself on her. Right. He always admitted. But what you're arguing now would be derivative of that argument. And that's a pretty tough argument. A Jackson claim on this evidence at this stage of the proceedings? Well, Your Honor, if I may redirect your attention to Adams v. Bradshaw on this dumbbell issue. Adams is not dispositive here. In Adams, Adams had a hearing on why, in his case, it was appropriate to have a restraint placed on him. And that decision was justified by factors specific to Adams. His prior record, his history of violent stories, his previous attorney. That was not the case in Leonard. I mean, those are what you call the closed case. This is not a closed case. Nothing in Leonard's record justifies placing a stumbelt on him. Well, the question whether it was justified and the question whether it was visible, those are two different questions. Well, in this case, you cannot defer to the state court's finding because it was visible. Because on these facts, that's an unreasonable termination of fact. Judge McKeegan. Even his sister said she didn't recognize it as a stumbelt at the time. And what are you supposed to say? The state court couldn't agree with that testimony along with the testimony of five other people who were there? But was it reasonable in light of the very small and unusually laid out courtroom? The prosecutor, I double checked in answer to Judge McKeegan's question, what did the prosecutor say about the layout of the courtroom? He said the prosecution was facing the jury and they could see the side of the defense table. That's 61-16, page ID 9110. It was a very small courtroom and they could see his profile the whole time for two weeks, not just when he got up to testify. And finally, it's not a subjective feeling that we're talking about. The Ohio Supreme Court says that of two co-defendants or two defendants that the council was representing, the duty of loyalty is owed to the corporation. It's the corporation that comes first. And in some ways, that's worse than representing multiple criminal defendants because one of them is prioritized by the governing Supreme Court law. And second, that there is no common defense to present because these are two separate suits. And yet, one affects the other. Thank you, Your Honor. Thank you. Thank you. Cases submitted. There being no further cases, the court may be adjourned. The court is now adjourned. Thank you. Thank you.